Paul J. O'BRYAN, Plaintiff,

v.

KTIV TELEVISION; Quincy Newspaper, Inc. d/b/a KTIV Television; New Jersey Herald, Inc., d/b/a KTIV Television, Defendants.

No. C 93–4089.

United States District Court,
N.D. Iowa,
Western Division.

Nov. 22, 1994.

**1150**

Gregg E. Williams and Charles E. Trullinger, Eidsmoe, Heidman, Redmond, Fredregill, Patterson & Schatz, Sioux City, IA, for plaintiff.

James C. Hanks, Klass, Hanks, Stoos, Villone, Sioux City, IA, Gregory J. Griffiths, Nancy B. Vollertsen, Dunlap & Seeger, P.A., Rochester, MN, for defendants.

## ORDER REGARDING MOTION FOR SUMMARY JUDGMENT

BENNETT, District Judge.

### TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND ................................. 1150
II. FINDINGS OF FACT ............................................. 1151
 A. Uncontested Facts ......................................... 1151
 B. Contested Facts. .......................................... 1154
III. CONCLUSIONS OF LAW .......................................... 1154
 A. Standard for Summary Judgment ......................... 1154
 B. Implied Covenant of Good Faith and Fair Dealing ......... 1156
 C. Invasion of Privacy Claim ................................. 1156
 D. ERISA Claim ............................................. 1159
 E. Infliction of Emotional Distress ........................... 1160
 1. Elements Of The Tort ............................... 1161
 2. Preemption By The Iowa Civil Rights Act ............ 1161
 3. Outrageous Conduct Requirement .................... 1163
 4. Evidence of Emotional Distress ...................... 1165
 F. Wrongful Discharge in Violation of Public Policy .......... 1166
 1. General Rule and History of Doctrine ............... 1167
 2. Preemption by Iowa Civil Rights Act ................ 1169
 G. Defamation and False Light Claims ........................ 1169
 H. Sex and Age Discrimination Claims ....................... 1171
 1. Burdens of Proof Under the ADEA ................... 1171
 2. Prima Facie Case .................................. 1172
 3. Pretext for Discrimination .......................... 1173
 4. Sex Discrimination Claims .......................... 1175
 I. Retaliation Claims ........................................ 1175
 1. Prima Facie Case .................................. 1175
 2. Pretext for Retaliation ............................. 1176
IV. CONCLUSION ................................................... 1177

This lawsuit arises out of the termination of a television station marketing executive. Plaintiff's complaint alleges he was discharged in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Employment Retirement Income Security Act of 1974 ("ERISA"), 28 U.S.C. § 1001 *et seq.* and state law claims of discharge in violation of Iowa public policy, violation of privacy, defamation, breach of covenant of good faith and fair dealing, sex and age discrimination, and infliction of emotional distress. Defendants have moved for summary judgment on all counts.

## I. INTRODUCTION AND BACKGROUND

This matter comes before the court pursuant to Defendants' Motion for Summary Judgment filed on September 30, 1994. De-

fendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(b) on each of Plaintiff Paul J. O'Bryan's claims. O'Bryan filed his resistance to Defendants' motion on November 2, 1994.

O'Bryan filed his complaint in this action on October 5, 1993, following his termination on August 2, 1993, as a marketing executive for Defendant KTIV Television. O'Bryan subsequently filed his first amended complaint on June 22, 1994. O'Bryan's first amended complaint alleges eleven causes of action.[1] O'Bryan alleges in his first cause of action that he was discharged because of his age in violation of the ADEA. In his second cause of action, O'Bryan alleges that he was fired in retaliation for his filing a complaint of age discrimination. In the third cause of action, O'Bryan asserts that he was fired in violation of ERISA in order that KTIV would not have to pay him certain employment benefits. The fourth cause of action asserts that O'Bryan was terminated in retaliation for his filing of discrimination charges in violation of Iowa Code Chapter 216. In causes of action five through nine, O'Bryan asserts pendent Iowa state common law claims for violation of privacy, breach of an implied covenant of good faith and fair dealing, infliction of emotional distress, defamation, and discharge in violation of Iowa public policy. Finally, in his eleventh cause of action, O'Bryan asserts that he was discharged on the basis of his gender in violation of Title VII. Defendants answered the first amended complaint on June 4, 1994, and asserted sixteen affirmative defenses. Plaintiff asserts jurisdiction pursuant to 29 U.S.C. § 626 and 29 U.S.C. § 1132.

## II. FINDINGS OF FACT

### A. Uncontested Facts

For the purposes of this summary judgement motion only, the court finds the following facts:

1. Plaintiff Paul J. O'Bryan is a male individual who resides in Sioux City, Iowa.

2. Defendants KTIV Television, Quincy Newspapers and Jersey Herald, Inc., (collectively "KTIV") are companies and corporations conducting business in Sioux City, Iowa, as an NBC television station affiliate.

3. On October 1, 1985, O'Bryan was hired by KTIV to be its General Sales Manager.

4. At the time O'Bryan became KTIV's General Sales Manager, Kim Cleaver was its Local Sales Manager.

5. O'Bryan had previously been employed at KCAU as an account executive. He eventually became KCAU's General Sales Manager before taking the position with KTIV.

6. In the fall of 1989, KTIV was purchased by Quincy Newspapers, Inc.

7. In November of 1989, William F. Turner became Vice President and General Manager for KTIV. Prior to that time he had worked at KCAU–TV in Sioux City, Iowa. While at KCAU, Turner had worked with O'Bryan. At some unidentified point after Turner became KTIV's General Manager, he mentioned to O'Bryan that Quincy had paid $21,000,000 for KTIV. Turner further expressed his opinion that he thought Quincy had paid too much for the station, and that as a result costs would have to be cut and revenues increased.

8. Late in 1991, O'Bryan's title and duties were changed and he was given the title of KTIV's National Sales Manager. KTIV, at that time, no longer had a general sales manager.

9. In the fall of 1992, Turner approached Cleaver about conducting a review of KTIV's sales department, and making recommendations for its improvement. Prior to that time Cleaver had been critical of O'Bryan's performance as KTIV's General Sales Manager.

10. Cleaver recommended that she be made KTIV's General Sales Manager and that Adrian Wisner be promoted to KTIV's Local Sales Manager. She further recommended that O'Bryan be given the position of KTIV's Local and Regional Sales Account Executive.

---

1. In his tenth cause of action O'Bryan seeks attorney fees and costs pursuant to 29 U.S.C. § 626(b) and Iowa Code § 216.15(8)(a)(8).

11. On November 9, 1992, O'Bryan was demoted to the position of KTIV's Local Regional Sales Account Executive.

12. An account executive is responsible for both servicing KTIV's existing clients and recruiting new · clientele.

13. At the same time Kim Cleaver was promoted to KTIV's General Sales Manager and assumed the duties formerly performed by O'Bryan as National Sales Manager, Adrian Wisner was promoted to KTIV's Local Sales Manager. Both Cleaver and Wisner are females. Cleaver was 33 years old at the time of her promotion to General Sales Manager.[2]

14. As a result of his demotion to an account executive, O'Bryan was given a desk and credenza in the "bull pen" with the other account executives. The bull pen is an office area with ten to fifteen cubicles in the center.

15. In November of 1992, an unknown person or persons went through O'Bryan's desk and credenza and removed from them certain KTIV sales information. Neither the desk nor the credenza were locked and the only items removed were property belonging to KTIV.

16. O'Bryan was aware that KTIV employees were permitted to enter his office in his absence to retrieve work related documents.

17. When O'Bryan learned of the search of his desk and credenza he confronted Wisner about it. Wisner, Cleaver and Turner denied any knowledge about the search. It is unknown who conducted the search of O'Bryan's desk.

18. On May 7, 1993, as a result of his demotion, O'Bryan filed charges of discrimination against Defendants with the Sioux City Human Rights Commission, and the Iowa Civil Rights Commission. Those charges were cross-filed with the Equal Employment Opportunity Commission ("EEOC"). O'Bryan subsequently received "right to sue" letters from both the Iowa Civil Rights Commission and the EEOC.

19. At some point early in 1993, Wisner developed and implemented a set of account executive performance guidelines.

20. KTIV's account executive performance guidelines had the following eight points:

1. Make monthly budgets.

2. Produce a percentage of Direct Business from 20% to 25%.

3. Bill an average of $4,000 a month in New direct business. This is to be business that you go out and develop.

4. Make at least 6 New Calls per weeks. (Face to Face Client Contacts).

5. Generate $325 per month in cash production billings.

6. Meet or exceed average proposal performance. Average is creating 4 tailor made proposals per week for clients and copying your Supervisor, Adrian Wisner. Proposals beyond this amount will be considered as exceeding this goal.

7. Demonstrate initiative taken on your own accounts and new projects.

8. Prioritize your social interactions.

a. Lunches, you are expected to attend a minimum of 75% of the Sales Lunches scheduled.

b. You are expected to attend and participate in 25% of the after hour business functions as identified by the Social Chairman.[3]

21. On June 1, 1993, Wisner met with O'Bryan to discuss his performance under the performance review system implemented at KTIV by Wisner. Each of the eight parts of the performance review were discussed with O'Bryan.[4] O'Bryan was specifically informed, among other things, that he had to increase his percentage of direct business

---

2. The record does not provide the age of Wisner at the time of her promotion to KTIV's Local Sales Manager.

3. A copy of KTIV's performance guidelines for its account executives is attached to Adrian Wisner's affidavit as exhibit B.

4. A document entitled "REVIEW OF PERFORMANCE" which sets forth the items discussed at the June 1, 1993, meeting is attached to Wisner's affidavit as exhibit "C", and is signed by Cleaver, Wisner and O'Bryan. Minutes for the June 1, 1993, meeting are attached to Wisner's affidavit as exhibit "D".

from twelve percent to twenty-five percent, generate $325 per month in cash production billings, and average $4,000 a month in "new direct business." O'Bryan was informed that the twenty-five percent direct business guideline was below the station's average of thirty-five percent and that his twelve percent figure was a station low. Wisner further informed O'Bryan that two other account executives were below the station average and that she would also be meeting with those individuals.

22. At the June 1, 1993, meeting, O'Bryan was placed on a 60 day probation and told that he was required to meet the guidelines or face termination. Wisner told O'Bryan that she wanted to meet with him every two weeks to review his progress.

23. On June 9, 1993, O'Bryan sent Wisner a letter in which he made comments about the performance guidelines and indicated his willingness to meet the guidelines.[5]

24. On June 21, 1993, Wisner, O'Bryan and Cleaver met again to discuss O'Bryan's sales performance.[6] Wisner informed O'Bryan that his monthly direct billing sat at seven percent, and that this level of business was not acceptable. Wisner also questioned O'Bryan regarding whether he was meeting the performance guidelines' requirement that account executives create four tailor made proposals per week for clients. Wisner further questioned O'Bryan as to his progress in following up on leads she had supplied him concerning prospective advertising customers. O'Bryan had not contacted a number of these leads.

25. On July 8, 1993, Wisner, O'Bryan and Turner met to discuss O'Bryan's sales progress.[7] At that meeting O'Bryan's new business production was discussed. Wisner pointed out that the goal was $4,000 but that

O'Bryan had only generated $3,372 for the month of June. Of that amount, $1,800 was from the Our Hometown account, which was not to count against the new direct business production requirement. Absent the Our Hometown business, O'Bryan had only generated $1,572 in new direct business for June. Wisner further discussed with O'Bryan his percentage of direct business. It was pointed out that his numbers were "not up to speed yet." O'Bryan's percentage of direct business stood at seven percent for May, 1993, and fifteen percent for June, 1993. Both of these numbers were below the performance guideline requirement of twenty-five percent. The three further discussed what O'Bryan was doing to create four custom made proposals per week as required by the guidelines. It was specifically pointed out to O'Bryan that the other account executives were producing four custom made packages a week.

26. On July 21, 1993, O'Bryan again met with Wisner and Turner to discuss his progress.[8] O'Bryan's direct new business stood at sixteen percent at the time of the meeting. O'Bryan also discussed with Turner and Wisner his new business numbers for the month. Wisner and Turner inquired into whether O'Bryan actually had made sales to certain prospective clients or was merely reporting tentative sales.

27. On August 2, 1993, O'Bryan, Wisner, Turner and Cleaver met to review O'Bryan's performance during the course of his sixty day probationary period.[9] Each of the account executive guidelines were discussed with O'Bryan. First, it was pointed out that O'Bryan had only made eighty-eight percent of his monthly budget projections for the months January through April. O'Bryan had made sixty-four percent of his monthly budget projections for May, fifty-two percent for

**5.** A copy of O'Bryan's June 9, 1993, letter is attached to Wisner's affidavit as exhibit "E".

**6.** A copy of the minutes to the June 21, 1993, meeting are attached to Wisner's affidavit as exhibit "F".

**7.** A copy of the transcribed recording of the July 8, 1993, meeting is attached to Wisner's affidavit as exhibit "G". Although O'Bryan asserts that he was unaware that the meeting was being

recorded, he does not challenge the accuracy of the transcription.

**8.** A transcribed copy of a recording of the July 21, 1993, meeting is attached to Wisner's affidavit as exhibit "H".

**9.** A copy of the transcribed recording of the August 2, 1993, meeting is attached to Wisner's affidavit as exhibit "I".

**1154**

June, and ninety-three percent for July. The second topic of conversation was O'Bryan's percentage of increase in direct business. O'Bryan's average for January through April stood at twelve percent. In May O'Bryan had a seven percent increase, a fifteen percent increase in June, and an eighteen percent increase in direct business in July. These numbers were all below the station's average of twenty-five percent. The third performance guideline was to average $4,000 a month per month in new direct business. O'Bryan had, from January through April of 1993, only generated $6,854 in new direct business. O'Bryan's direct new business in May 1993 was $1,074. Excluding Our Hometown and Timeshares' accounts, O'Bryan had new direct business in June of $1,188 and in July of $2154. Fourth, Wisner indicated that O'Bryan had met the guidelines cash production billings number of $325 per month in May with $390 in production billings, and June with $660 in billings, but had only $195 in billings for the month of July. Fifth, Wisner informed O'Bryan that he had only made what she deemed to be fourteen custom made proposals during the period of his probation when he should have produced thirty-six. Sixth, Wisner pointed out to O'Bryan that he had failed to demonstrate initiative on his own accounts and projects. Finally, Wisner indicated that O'Bryan had met guidelines for participation in sales lunches. Overall, Wisner assessed that O'Bryan had only met one of the seven guidelines during his probation period. O'Bryan's employment with KTIV was then terminated during the meeting.

28. O'Bryan was fifty-eight years of age as of August 2, 1993, the date his employment with KTIV was terminated.

### B. Contested Facts.

1. Whether KTIV's agents made derogatory remarks concerning O'Bryan's work performance.

### III. CONCLUSIONS OF LAW

#### A. Standard for Summary Judgment

The Eighth Circuit recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions,* 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Wabun–Inini,* 900 F.2d at 1238 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986)); *Hartnagel v. Norman,* 953 F.2d 394, 396 (8th Cir.1992).

The standard for granting summary judgment is well established. Rule 56 of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

Fed.R.Civ.P. 56(b) & (c) (emphasis added); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Munz v. Michael,* 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S. Great Lakes Fleet, Inc.,* 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone,* 993 F.2d 1328, 1331 (8th Cir.1993); *Woodsmith Publishing Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir.1990); *Wabun–Inini,* 900 F.2d at 1238

(citing *Fed.R.Civ.P.* 56(c)).[10] A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, here O'Bryan, and give O'Bryan the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Munz v. Michael*, 28 F.3d 795, 796 (8th Cir.1994); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir.1994); *Johnson v. Group Health Plan, Inc.*, 994 F.2d 543, 545 (8th Cir.1993); *Burk v. Beene*, 948 F.2d 489, 492 (8th Cir.1991); *Coday v. City of Springfield,* 939 F.2d 666, 667 (8th Cir.1991), *cert. denied*, 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

Procedurally, the moving party, KTIV, bears "the initial responsibility of informing the district court of the basis for their motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553); *see also Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir.1993). KTIV is not required by Rule 56 to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

"When a moving party has carried its burden under Rule 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. O'Bryan is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Although "direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances

relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro Products, Inc. v. Herrick*, 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that O'Bryan must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir.1994).

In *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510-11, *Celotex*, 477 U.S. at 323-24, 106 S.Ct. at 2552-53, and *Matsushita*, 475 U.S. at 586-87, 106 S.Ct. at 1355-56 the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). The trial court, therefore, must "assess the adequacy of the nonmovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." *Hartnagel*, 953 F.2d at 396 (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552). If O'Bryan fails to make a sufficient showing of an essential element of a claim with respect to which he has the burden of proof, then KTIV is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552-53; *Woodsmith*, 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted. *Anderson*, 477 U.S. at 248, 106

---

10. An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Hartnagel*, 953 F.2d 394.

S.Ct. at 2510; *Burk,* 948 F.2d at 492; *Woodsmith,* 904 F.2d at 1247. With these standards in mind, the court turns to consideration of the KTIV's Motion for Summary Judgment.

### B. Implied Covenant of Good Faith and Fair Dealing

■ KTIV initially asserts that Iowa does not recognize the cause of action of breach of an implied covenant of good faith and fair dealing. Therefore, KTIV argues that the court should grant summary judgement on O'Bryan's ninth cause of action. O'Bryan concedes "that he does not have a cause of action for breach of an implied covenant of good faith and fair dealing." Plaintiff's Statement of Disputed Facts at ¶ 14. It must be noted that the Iowa Supreme Court has never recognized such a cause of action. In *Fogel v. Trustees of Iowa College,* 446 N.W.2d 451, 456–57 (Iowa 1989), the court found that

> [t]he doctrine stems from the implied duty of good faith and fair dealing recognized in all contracts. *See* Restatement (Second) of Contracts § 205 (1981). Applied in the employment context, an employee proving a *prima facie* case of unjust termination could shift to the employer the burden of proving good faith as a defense. The classic case invoking such a duty of good faith would be the discharge of a thirty-year employee six months before a pension vests, or the dismissal of an employee for spurning the affections of a co-worker.
>
> Only a small handful of states have adopted the doctrine. Although *Fogel* suggests we adopt the action as a tort, four of the five states that recognize the covenant treat it as a contract-based action. New Hampshire, the leading state recognizing the covenant of good faith, has since limited the action to dismissals that are in violation of public policy.

The majority of jurisdictions that have addressed the covenant have unequivocally rejected it.

*Id.* at 456–57 (citations omitted). The Iowa Supreme Court has since interpreted *Fogel* as expressly rejecting a cause of action for breach of an implied covenant of good faith and fair dealing in employment situations. *Porter v. Pioneer Hi–Bred Int'l, Inc.,* 497 N.W.2d 870, 871 (Iowa 1993); *French v. Foods, Inc.,* 495 N.W.2d 768, 771 (Iowa 1994); *Grahek v. Voluntary Hosp. Co-op Ass'n of Iowa, Inc.,* 473 N.W.2d 31, 34 (Iowa 1991). Therefore, the court concludes that KTIV is entitled to summary judgment on O'Bryan's claim of breach of covenant of good faith and fair dealing.

### C. Invasion of Privacy Claim [11]

KTIV next contends that O'Bryan has failed to set forth such facts as would support a cause of action for invasion of privacy under Iowa law. O'Bryan disputes this contention and asserts that a material fact question on this issue has been generated.

The Iowa Supreme Court first recognized the tort of invasion of privacy in *Bremmer v. Journal–Tribune Publishing Co.,* 247 Iowa 817, 821–22, 76 N.W.2d 762, 764–65 (1956). *Stessman v. Am. Black Hawk Broadcasting Co.,* 416 N.W.2d 685, 686 (Iowa 1987); *Howard v. Des Moines Register & Tribune Co.,* 283 N.W.2d 289, 291 (Iowa 1979), *cert. denied,* 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980); *Winegard v. Larsen,* 260 N.W.2d 816, 818 (Iowa 1977). In *Bremmer,* the tort was defined as invasion of "the right of an individual to be let alone, to live a life of seclusion, to be free from unwarranted publicity." *Bremmer,* 247 Iowa at 821, 76 N.W.2d at 764. Since recognition of the tort in *Bremmer,* the Iowa Supreme Court has adopted and applied the principles of invasion of privacy articulated in the Restate-

---

**11.** This section relates solely to the allegations raised in the first amended complaint's fifth cause of action. Paragraph 33 of the first amended complaint states that:

> KTIV and/or some third parties invaded the privacy of O'Bryan by entering his personal office in November 1992, and without his permission or knowledge, examining the contents

of his office and desk, and removing certain materials that were in his possession and control, when those same materials could have been requested or obtained at any time in O'Bryan's presence.

O'Bryan also sets out a claim for defamation and false public light in his sixth cause of action. Those claims are to be discussed below. *See infra* at 1169–70.

ment (Second) of Torts (1977). *Stessman,* 416 N.W.2d at 686; *Lamberto v. Bown,* 326 N.W.2d 305, 309 (Iowa 1982); *Anderson v. Low Rent Housing Comm'n of Muscatine,* 304 N.W.2d 239, 248 (Iowa), *cert. denied,* 454 U.S. 1086, 102 S.Ct. 645, 70 L.Ed.2d 621 (1981); *Howard,* 283 N.W.2d at 291; *Winegard,* 260 N.W.2d at 822 (first applying those principles).

The Restatement principles the Iowa Supreme Court has adopted are found in § 652A and subsequent sections defining each form of the tort. Section 652A states as follows:

(1) One who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other.

(2) The right of privacy is invaded by

(a) unreasonable intrusion upon the seclusion of another, as stated in § 652B; or

(b) appropriation of the other's name, or likeness, as stated in § 652C; or

(c) unreasonable publicity given to the other's private life, as stated in § 652D; or

(d) publicity that unreasonably places the other in a false light before the public, as stated in § 652E.

*Winegard,* 260 N.W.2d at 822 (citing *Yoder v. Smith,* 253 Iowa 505, 508, 112 N.W.2d 862, 863–64 (1962)). The court in *Winegard* clarified the requirements of each of these forms of the tort. *Id.* The form of the tort in question here, intrusion upon seclusion, was defined in *Winegard* as follows:

Category (a) requires an intentional intrusion upon the solitude or seclusion of another which would be highly offensive to a reasonable person. § 652B.

*Id.*[12] The court noted further that both categories (c) and (d) of the tort require publicity or publication of some sort, and that the latter category overlaps the law of defamation. *Id.* at 823; *see also Anderson,* 304 N.W.2d at 248 (Category (d) "false light" theory of the tort, stating that although untruthfulness is required, it is not necessary for the plaintiff to prove that he or she was defamed); *Howard,* 283 N.W.2d at 298 (Cat-

---

**12.** Comments to the Restatement (Second) of Torts § 652B further clarify this formulation of the tort:

*a.* The form of invasion of publicity covered by this Section does not depend upon any publicity given to the person whose interest is invaded or to his affairs. It consists solely of an intentional interference with his interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable [person].

*b.* The invasion may be by physical intrusion into a place in which the plaintiff has secluded himself, as when the defendant forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objections in entering his home. It may also be by use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs windows with binoculars or tapping telephone wires. *It may be by some other form of investigation or examination into his private concerns, as by opening his private mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents.* The intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of photograph or information outlined. . . .

*c.* The defendant is subject to liability under the rule stated in this Section only when he has

intruded into a private place, or has otherwise invaded a private seclusion that plaintiff has thrown about his person or affairs. Thus there is no liability for the examination of a public record concerning the plaintiff, or of documents that the plaintiff is required to keep and make available for public inspection. Nor is there liability for observing him or even taking his photograph while he is walking on the public highway, since he is not then in seclusion, and his appearance is public and open to the public eye. Even in a public place, however, there may be some matters about the plaintiff, such as his underwear or lack of it, that are not exhibited to the public gaze; and there may still be invasion of privacy when there is intrusion upon these matters. . . .

*d.* There is likewise no liability unless the interference with the plaintiff's seclusion is a substantial one, of a kind that would be highly offensive to the ordinary reasonable man, as the result of conduct to which the reasonable man would strongly object. Thus there is no liability for knocking at the plaintiff's door, or calling him to the telephone on one occasion or even two or three, to demand payment of a debt. It is only when the telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff, that becomes a substantial burden to his existence, that his privacy is invaded. . . . (emphasis added.).

**1158**

egory (d) publicity theory of invasion of privacy).[13] Category (a) of the tort, however, does not require publication. *Lamberto,* 326 N.W.2d at 309; *Winegard,* 260 N.W.2d at 822; Restatement (Second) of Torts § 652B, comment a.

■ To recover under the intrusion upon seclusion theory of the tort,

a plaintiff must show, first, that the defendant intentionally intruded upon the seclusion that the plaintiff "has thrown about [his or her] person or affairs." Restatement § 652B comment c; *accord Winegard,* 260 N.W.2d at 822. Second, the intrusion must be one that would be "highly offensive to a reasonable person." *Winegard,* 260 N.W.2d at 822; *accord* Restatement § 652B. The defendant is not liable, however, if the plaintiff is already in public view. Restatement § 652B comment c.

*Stessman,* 416 N.W.2d at 687. The Iowa courts have made no other articulation of the elements of the intrusion on seclusion theory of the tort.

■ Applying these standards here, the court concludes that KTIV is entitled to summary judgment against O'Bryan on his claim of invasion of privacy. First, O'Bryan has not been able to establish who searched his desk. He assumes that it was an employee of KTIV, but has alleged no facts to support his hypothesis. Additionally, O'Bryan has not shown that the individuals, even if KTIV employees, were acting within the scope of their employment with KTIV. Absent such a showing, the individual's actions cannot be imputed to KTIV since, under Iowa's doctrine of respondeat superior, an employer will be liable for the act of an employee only while the employee is acting in the scope of the individual's employment. *Jones v. Blair,* 387 N.W.2d 349, 355 (Iowa 1986); *see Burr v. Apex Concrete Co.,* 242 N.W.2d 272, 276 (Iowa 1976).

■ Furthermore, even if the court were to assume that an employee of KTIV conducted the search, the court finds that, given the facts of this case, such a search would not constitute an intentional intrusion upon the solitude or seclusion of O'Bryan which would be highly offensive to a reasonable person. In the related context of the reasonableness of a government employee's expectation of privacy in his workplace was recently explored by the Supreme Court in *O'Connor v. Ortega,* 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987). Initially, the court pointed out that an "employee's expectation of privacy must be assessed in the context of the relation[ship]." *Id.* at 717, 107 S.Ct. at 1497. In *Ortega,* the desk and files of Dr. Ortega, a state employee, were searched by his employer and several personal items were seized. *Id.* at 712–13, 107 S.Ct. at 1494–95. Ortega brought an action under 42 U.S.C. § 1983 against several hospital administrators alleging that the search violated the Fourth Amendment. *Id.* at 714, 107 S.Ct. at 1495–96. The Supreme Court then went on to conclude that Dr. Ortega had a reasonable expectation of privacy in his desk and file cabinets, both of which were located in his office. *Id.* at 718, 107 S.Ct. at 1498. The Court found significant the personal nature of the items in the desk and file cabinets, "which included personal correspondence, medical files, correspondence from private patients unconnected to the Hospital, personal financial records, teaching aids and notes, and personal gifts and mementos." *Id.*

Following the principles set out in *Ortega,* the Second Circuit held this year in *Sheppard v. Beerman,* 18 F.3d 147, 152 (2d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 73, 130 L.Ed.2d 28 (1994), that a law clerk did not have a reasonable expectation of privacy in his office furniture or file cabinets. In *Beerman,* a law clerk brought an action under 42 U.S.C. § 1983 alleging that his prior employer's search of his office following his dismissal violated his Fourth Amendment rights. *Id.* at 149. The court concluded that the judge's search of his former law clerk's office was not violative of the clerk's Fourth Amendment rights because the clerk has no expectation of privacy in his office. *Id.* at 152. The court's rationale was that, due to

---

**13.** Restatement (Second) of Torts § 652A, comment d, recognizes that the various forms of invasion may also overlap.

the open and unique nature of the working relationship between a judge and the judge's clerk, the clerk had no reasonable expectation of privacy in his desk or file cabinets. *Id.*

Similarly, here the court finds that, on the record before it, O'Bryan did not have a reasonable expectation of privacy that his employer would not search his desk or officer area for employer owned documents. O'Bryan's desk was in an open, accessible area of KTIV. Neither his desk nor credenza was locked. Additionally, both pieces of office furniture contained sales information which was the property of his employer. Furthermore, O'Bryan assumed that, in his absence, fellow employees would be able to go into his office to retrieve employment related documents.[14] *Cf. Hoth v. American States Ins. Co.*, 735 F.Supp. 290 (N.D.Ill. 1990) (concerning an Illinois invasion of privacy claim brought by a former employee against his former employer arising from the employer's search of the employee's office, file cabinet and desk, without the employee's consent, the district court determined that the employee had failed to state a claim upon which relief might be granted because the employee failed to allege the employer lacked authority to conduct the search). Although "[a] search of an employee's workplace which is done in such a way as to reveal matters unrelated to the workplace, may constitute tortious invasion of the employee's privacy," *Doe v. Kohn, Nast & Graf, P.C.*, 862 F.Supp. 1310, 1326 (E.D.Pa.1994), here the search was apparently conducted to obtain employer owned documents since no matters unrelated to the workplace were revealed or removed from O'Bryan's office.

Therefore, because O'Bryan has not shown that the search of his office was conducted by a KTIV employee, that if the search was done by a KTIV employee that the employee was acting within the scope of his or her employment while conducting the search, or that he had a reasonable expectation of privacy that his employer would not search his office area for employer owned documents, the court concludes that summary judgment shall be granted against O'Bryan on his claim for invasion of privacy.[15]

### D. ERISA Claim

The court next turns to O'Bryan's ERISA claim. O'Bryan alleges in the third cause of action found in the first amended complaint that:

27. O'Bryan was receiving benefits from KTIV Television, which included, but were not limited to, medical insurance, life insurance, and pension benefits under the KTIV Profit Sharing and Retirement Plan.

28. O'Bryan was discriminatorily [sic] discharged by KTIV, in part, to save on pension contributions, all of which is in violation of ERISA, 29 U.S.C. § 1132 et seq.

First Amended Compl. at 6.[16]

"ERISA discrimination claims are analyzed under the three-stage framework used in Title VII and ADEA cases." *Rath v. Selection Research, Inc.*, 978 F.2d 1087, 1089 (8th Cir.1992) (citing with approval *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1112 (2d Cir.1988)). The framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973), has been summarized by the United States Supreme Court as follows:

First, the plaintiff has the burden of proving by the preponderance of the evidence a

14. The record is devoid of information concerning what, if any, type of personal property O'Bryan maintained in his desk and credenza.

15. As an additional factual basis for his invasion of privacy claim, O'Bryan asserts that Defendants had certain conversations and conferences with him secretly recorded. These allegations, however, do not appear in the amended complaint.

16. 29 U.S.C. § 1140, provides in pertinent part:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan [or] this subchapter.... It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against any person because he has given information or has testified or is about to testify in any inquiry or proceeding relating to this chapter....

*prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection...." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824).

 Thus, to sustain a cause of action under section 1140, a plaintiff must demonstrate: (1) that he is a member of a protected class, *i.e.,* an employee who may be entitled to the benefit of a covered plan; (2) that he was qualified for the position he held; and (3) that the timing of the discharge and the resulting savings to the employer raised an inference of discrimination. *Dister,* 859 F.2d at 1115.

 Applying these standards here, O'Bryan has failed to make out a *prima facie* case sufficient to withstand summary judgment. Although O'Bryan was in a protected group and the court will assume that he was qualified for his position, he has failed to show that his discharge resulted in any savings to KTIV. O'Bryan asserts that summary judgment is inappropriate here because a material fact exists concerning KTIV's intent and motivation in firing him. O'Bryan must, nevertheless, offer "concrete evidence from which a reasonable juror could return a verdict in his favor ..." *Liberty Lobby,* 477 U.S. at 256, 106 S.Ct. at 2514. The circumstances in this case are insufficient to give rise to an inference of discrimination. The only circumstances which O'Bryan points the court to are the facts that KTIV was purchased in 1989 by Quincy for a reported $21,000,000 and Turner's subsequently telling O'Bryan that he thought Quincy had paid too much for the station and that they'd have to cut costs and raise revenues. It must be remembered that Quincy purchased the sta-

tion in the fall of 1989, and O'Bryan was not discharged from his employment until August 3, 1993, nearly four years later. Furthermore, O'Bryan does not place the statement from Turner in any time frame. Clearly, he does not place it in close proximity with the time of his discharge nor demonstrate that KTIV's finances were such that cost cutting was being contemplated at the time of his dismissal. Additionally, O'Bryan has not demonstrated that his termination would result in cost savings to KTIV. " 'No ERISA cause of action lies where the loss of pension benefits was a mere consequence of, but not a motivating factor behind, a termination of employment.' " *Dister,* 859 F.2d at 1111 (quoting *Titsch v. Reliance Group, Inc.,* 548 F.Supp. 983, 985 (S.D.N.Y.1982), *aff'd,* 742 F.2d 1441 (2d Cir.1983)).

In *Dister,* the plaintiff established a *prima facie* case that he was discharged under circumstances giving rise to an inference of discrimination by showing that he was discharged four months and seven days before his benefits were to vest and that his discharge saved the defendant approximately $550,000. *Dister,* 859 F.2d at 1114. The court also noted that the plaintiff, a vested employee, was discharged while a non-vested employee was permitted to remain with the defendant corporation. *Id.* O'Bryan has made no similar showing here. Finding the record in this case is devoid of evidence of intentional discrimination, the court shall grant this aspect of KTIV's motion and dismiss O'Bryan's ERISA claim set out in the amended complaint's as O'Bryan's fourth cause of action.

### E. Infliction of Emotional Distress

KTIV next seeks summary judgment on O'Bryan's claim of intentional infliction of emotional distress. KTIV challenges this claim on the ground that, as a matter of law, the Iowa Civil Rights Act, Iowa Code § 216.16, provides the exclusive remedy for the conduct alleged. KTIV also challenges the claim on the ground that it fails to state a claim upon which relief can be granted because, even if true, O'Bryan's allegations fail to meet the Iowa Supreme Court's require-

ments for either outrageous conduct or severe emotional distress.

■ *1. Elements Of The Tort.* The elements for recovery on the common law tort of intentional infliction of emotional distress in Iowa are:

(1) outrageous conduct by the defendant;

(2) the defendant's intentional causing, or reckless disregard of the probability of causing emotional distress;

(3) plaintiff suffered severe or extreme emotional distress;

(4) actual and proximate cause of the emotional distress by the defendant's conduct.

*Cutler v. Klass, Whicher & Mishne,* 473 N.W.2d 178, 183 (Iowa 1991) (citing *Vaughn v. Ag Processing, Inc.,* 459 N.W.2d 627, 635–36 (Iowa 1990), and *Vinson v. Linn–Mar Community Sch. Dist.,* 360 N.W.2d 108, 118 (Iowa 1984)).

KTIV asserts that O'Bryan's claim of intentional infliction of emotional distress is only cognizable as a claim under the Iowa Civil Rights Act, because his allegations concerning outrageous conduct for the common law tort are in part identical to his allegations of sex and age discrimination, for which the exclusive remedy is found in Iowa Code Ch. 216. The court, therefore, will consider first whether the remedies provided by the Iowa Civil Rights Act are O'Bryan's exclusive remedies for his claim of intentional infliction of emotional distress. Once that question is answered, the court will consider whether O'Bryan's claim makes a sufficient showing for recovery on the tort of infliction of emotional distress.

■ *2. Preemption By The Iowa Civil Rights Act.*[17] Iowa Code Chapter 216 (1993) established the Iowa Civil Rights Commission and provides statutory remedies for enforcement of basic civil rights.[18] *Greenland v. Fairtron Corp.,* 500 N.W.2d 36, 37 (Iowa 1993). The Iowa Supreme Court has declared that section 216.16(1) renders the chapter's remedies exclusive and preemptive. *Id.; Grahek v. Voluntary Hosp. Coop. Ass'n of Iowa, Inc.,* 473 N.W.2d 31, 33 (Iowa 1991); *Northrup v. Farmland Indus., Inc.,* 372 N.W.2d 193, 197 (Iowa 1985). Preemption occurs unless the claims are separate and independent, and therefore incidental, causes of action. *Greenland,* 500 N.W.2d at 38; *Grahek,* 473 N.W.2d at 34; *Vaughn,* 459 N.W.2d at 639. "The claims are not separate and independent when, under the facts of the case, success in the nonchapter [216] claims . . . requires proof of discrimination." *Greenland,* 500 N.W.2d at 38.

**17.** Although the Iowa Supreme Court has consistently described the effect of Chapter 216 on other claims arising out of discrimination as "preemption," the court believes that Chapter 216 actually provides the "exclusive remedy" for such claims, *see* Iowa Code § 216.16(1), rather than "preempting" any claims. "Preemption" has traditionally referred to situations in which federal law displaces state law, or the law of one level of government displaces the law of another:

Under the Supremacy Clause, U.S. Const., Art. VI, cl. 2, state laws that "interfere with, or are contrary to the laws of congress, made in pursuance of the constitution" are invalid. The ways in which federal law may pre-empt state law are well established. . . . Congress' intent to supplant state authority in a particular field may be expressed in the terms of the statute. Absent explicit pre-emptive language, Congress' intent to supersede state law in a given area may nonetheless be implicit if a scheme of federal regulation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," if "the Act of Congress . . . touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or if the goals "sought to be obtained" and the "obligations imposed" reveal a purpose to preclude state authority.

*Wisconsin Public Intervenor v. Mortier,* 501 U.S. 597, 604–05, 111 S.Ct. 2476, 2482–83, 115 L.Ed.2d 532 (1991) (citations omitted). Thus, "where [state] law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress," federal preemption occurs. *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank,* —— U.S. ——, ——, 114 S.Ct. 517, 526, 126 L.Ed.2d 524 (1993) (citing *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984)). The situation here is not such a case of displacement of law among levels of government. Instead, the court is confronted with determining which state law, statutory or common law, provides the exclusive remedy for alleged wrongs.

**18.** Iowa Code Chapter 216 was formerly found in Iowa Code Chapter 601A. All references in this opinion will be to Iowa Code Chapter 216.

The Iowa Supreme Court has addressed the preemption issue in an extremely limited number of cases. The seminal case was *Northrup*, 372 N.W.2d 193. In *Northrup*, the Iowa Supreme Court held that then chapter 601A provided the exclusive remedy for alleged wrongful discharge for alcoholism and refused to recognize the plaintiff's independent common-law action for wrongful discharge. *Id.* at 197. The court, however, went on to entertain the plaintiff's claim that his discharge for alcoholism constituted intentional infliction of emotional distress. *Id.* at 197–99. The court concluded that discharge of a plant superintendent for alcoholism, when the superintendent has extensive responsibilities for plant operations, buying, production scheduling, maintenance, and plant safety was not outrageous conduct, nor was general criticism of the superintendent's performance outrageous. *Id.* at 198.

The Iowa Supreme Court subsequently clarified its holding in *Northrup* in *Hamilton v. First Baptist Elderly Housing Found.*, 436 N.W.2d 336 (Iowa 1989). In *Hamilton*, the plaintiff alleged discharge of an at-will employee in violation of public policy, but the court found that her argument "basically boil[ed] down to an assertion of sex discrimination." *Id.* at 341. The court concluded that *Northrup* held that the civil rights statute preempts independent common law actions also premised on discrimination. *Id.* The court stated that

> [plaintiff] failed in her bid to prove sex discrimination. *Northrup* forbids her a second bite of the apple in the form of an independent common law action also premised on sex discrimination.

*Id.* at 341–42; *see also Borschel v. City of Perry*, 512 N.W.2d 565, 567–68 (Iowa 1994) (citing *Hamilton*, court held that civil rights statute preempts claim of wrongful discharge in violation of public policy when the claim is premised on discriminatory acts). Similarly, in *Vaughn*, 459 N.W.2d 627 (Iowa 1990), the Iowa Supreme Court held that the trial court properly dismissed, as preempted by the civil rights statute, claims of wrongful discharge, unfair employment practices and termination in bad faith and actual malice because all were based on religious discrimination. *Id.*

at 639. The court further concluded that a claim based on violation of criminal statutes was preempted. *Id.* at 638. The court, however, held that a claim of breach of contract was not preempted, because it was a separate and independent cause of action triable to a jury. *Id.* at 639.

In *Grahek*, 473 N.W.2d 31, the court also held that a breach of contract claim was not preempted by the civil rights statute even when the plaintiff believed that he was fired because of his age because

> [plaintiff] need not prove it to be successful in his contract claim. In this count he is claiming that the employment contract was breached by his premature termination in violation of the terms of the alleged contract. The claim of age discrimination is only incidental to the separate and independent cause of action for breach of contract.

*Grahek*, 473 N.W.2d at 34. The Iowa Supreme Court, however, distinguished wrongful discharge claims based on at-will employment from the one encountered by the plaintiff alleging breach of an employment contract, noting that "in an at-will situation, either party may terminate the employment at any time for any reason except discrimination under chapter 601A or violation of public policy." *Id.* The court further noted that

> [s]ince in at-will employment situations involving allegations of discrimination the claim of wrongful discharge and the claim of discrimination are one and the same, Iowa Code section 601A.16 requires that the employee follow the procedures provided in that chapter.

*Id.* The court, however, did find that the plaintiff's breach of implied covenant of good faith and fair dealing claims were preempted because

> the only act of bad faith which [plaintiff] alleges is age discrimination. Thus, as in at-will employment arrangements, the bad faith claim and the chapter 601A civil rights claim are the same. Therefore, chapter 601A preempts the tort claim.

*Id.* Claims of fraudulent and negligent misrepresentation, which were not based on unfair or discriminatory practices, but on earlier acts, were not preempted. *Id.* at 35.

Finally, in *Greenland,* 500 N.W.2d 36, the Iowa Supreme Court held that a claim of intentional infliction of emotional distress was preempted by chapter 216 because the plaintiff had to prove sexual discrimination to be successful in the emotional distress claim. *Id.* at 38. The court held that the test is whether, in light of the pleadings, discrimination is made an element of the alternative claims. *Id.*

> We think the answer with regard to the emotional distress claim is yes, resulting in preemption. Discrimination through sexual harassment is the "outrageous conduct" [plaintiff] specifically alleges in her claim for intentional infliction of emotional distress. So under the facts she alleges, if she were to fail in her claim of discrimination, [plaintiff] would necessarily fail in her claim of intentional infliction of emotional distress. Stated otherwise, it is impossible for [plaintiff] to establish the emotional distress she alleges without first proving discrimination.

*Id.* The court also addressed the apparent inconsistency between this holding and the *Northrup* decision in which the court had entertained an emotional distress claim based on termination for alcoholism after concluding that the plaintiff had a viable claim under chapter 216 for discrimination on the basis of alcoholism. *Northrup,* 372 N.W.2d at 197–99. In *Greenland,* the court noted that its decisions in *Vaughn* and *Northrup* did not implicitly allow separate claims for intentional infliction of emotional distress in conjunction with Chapter 216 discrimination claims because preemption of the

emotional distress claims had never been raised or considered in either appeal. *Greenland,* 500 N.W.2d at 38.

■ Here, the same facts alleged in support of Bryan's claims of age and sex discrimination are incorporated in the claim of intentional infliction of emotional distress and Bryant alleges that these discriminatory acts of KTIV constitute outrageous conduct. *See* Amended Compl. Seventh Cause of Action.[19] Therefore, under *Greenland,* the claim of intentional infliction of emotional distress predicated on these allegedly discriminatory acts is preempted by Chapter 216 of the Iowa Code.

The court finds that O'Bryan's claim of intentional infliction of emotional distress is preempted by the Iowa Civil Rights Act because it is impossible for O'Bryan to establish the emotional distress he alleges without first proving discrimination. *See Greenland,* 500 N.W.2d at 38. The court, therefore, concludes that the Iowa Civil Rights Act provides O'Bryan with his exclusive remedy for the conduct complained of here. Although the court need not do so in light of the court's prior holding, the court will nonetheless proceed to determine, in the alternative, whether O'Bryan has made a sufficient showing for recovery under the tort.

■ **3. Outrageous Conduct Requirement.** The court will now consider whether KTIV's assertion that even if O'Bryan's claim is not barred by the exclusivity of Chapter 216, summary judgment is appropriate because O'Bryan cannot produce

---

**19.** In his seventh cause of action, O'Bryan alleges that:

> 36. O Bryan repeats the allegations set forth in paragraphs 1–35 as though fully set forth herein.
>
> 37. KTIV, with wanton disregard for O'Bryan, demoted and ultimately discharged him within two months of when he filed his age discrimination charges with the appropriate administrative agencies. KTIV did so with full knowledge that this discharge would adversely affect O'Bryan and would make it extremely difficult, if not impossible for a man of O'Bryan's age to obtain similar or comparable employment within the community.
>
> 38. As a result of the reckless and egregious conduct of KTIV set forth above, O'Bryan has suffered severe emotional distress, based upon

improper demotion, wrongful discharge, false accusations; perceived loss of self-worth; and damage to his reputation in the business community where he has earned his living for over 30 years.

> 39. KTIV has engaged in this conduct in reckless disregard for the rights of O'Bryan under both state and federal law, all of which has severely damaged O'Bryan's emotional state and overall health.

Amended Compl. at 7–8. The court concludes that these allegations of outrageous conduct are cognizable as age discrimination claims. Specifically, a claim for intentional infliction of emotional distress which are tied to his filing of an age discrimination complaint. Therefore, these claims would be preempted by Iowa Code § 216.6.

evidence of sufficiently outrageous conduct. The Iowa Supreme Court has said that when a plaintiff brings a claim of intentional infliction of emotional distress, "it is for the court to determine in the first instance, as a matter of law, whether the conduct complained of may reasonably be regarded as outrageous." *Cutler v. Klass, Whicher & Mishne*, 473 N.W.2d 178, 183 (Iowa 1991); *Mills v. Guthrie County Rural Elec.*, 454 N.W.2d 846, 849 (Iowa 1990); *M.H. ex rel. Callahan v. State*, 385 N.W.2d 533, 540 (Iowa 1986); *Reihmann v. Foerstner*, 375 N.W.2d 677, 681 (Iowa 1985); *Vinson v. Linn–Mar Comm. Sch. Dist.*, 360 N.W.2d 108, 118 (Iowa 1984); *Roalson v. Chaney*, 334 N.W.2d 754, 756 (Iowa 1983). .The Iowa Supreme Court has required an extreme of egregiousness to elevate (or downgrade) mere bad conduct to the level of outrageousness. *See Northrup*, 372 N.W.2d at 198. For conduct to rise to the level of outrageous, it must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.". *Cutler*, 473 N.W.2d at 183 (citing *Vaughn*, 459 N.W.2d at 636); *Engstrom v. State*, 461 N.W.2d 309, 320 (Iowa 1990) (quoting *Vinson*, 360 N.W.2d at 118); *Harsha v. State Sav. Bank*, 346 N.W.2d 791, 801 (Iowa 1984) (quoting Restatement (Second) of Torts § 46 comment d (1965)). Indeed, the Iowa court has said that

> [t]he tort law should encourage a certain level of emotional toughness. "The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." Restatement (Second) of Torts § 46, comment d, *supra*. "Against a large part of the frictions and irritations and clashing of temperaments incident to participation in a community life, a certain toughening of the mental hide is a better protection than the law could ever be." Magruder, *Mental and Emotional Disturbance in the Law of Torts*, 49 Harv.L.Rev. 1033, 1035 (1936).

*Northrup*, 372 N.W.2d at 198–99 (quoting *Meyer v. Nottger*, 241 N.W.2d 911, 918 (Iowa 1976)). Peculiar susceptibility, by reason of physical or mental condition of the person affected, is a factor in considering whether conduct is outrageous, although "major outrage" is always the crucial element of the tort. *Cutler*, 473 N.W.2d at 183 (quoting Restatement (Second) of Torts § 46, comment f). In *Northrup*, the court quoted extensively from the Restatement (Second) of Torts § 46, comment d, for a statement of the level of bad conduct necessary to be held to be outrageous:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.
>
> Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Northrup*, 372 N.W.2d at 198. Iowa courts have held, as the Restatement suggests, that it is not even sufficient that the conduct in question would have entitled the plaintiff to punitive damages. *Mills*, 454 N.W.2d at 850 (citing *Vinson*, 360 N.W.2d at 118).

It is a simpler matter to discover what kinds of behavior the Iowa Supreme Court has held insufficiently outrageous to sustain the tort than it is to find out what kind of behavior is sufficiently egregious. *See, e.g., Cutler*, 473 N.W.2d at 183 (letter advising partner who had suffered from a period of mental illness that he could not return to law practice without further review by partners was not extremely outrageous and did not generate a genuine issue of material fact on the claim); *Engstrom*, 461 N.W.2d at 320 (negligent failure to search for plaintiffs' adopted daughter's natural father before placing her in plaintiffs' home, and telling

adoptive parents the father was dead without verifying his death, were not outrageous); *Kirk v. Farm & City Ins. Co.,* 457 N.W.2d 906, 911 (Iowa 1990) (insurance company's refusal to pay the full amount of uninsured coverage not outrageous); *Mills,* 454 N.W.2d at 849 (rural electric cooperative's conduct in using split bolt connectors instead of compression connectors to connect grounding jumper wire to main neutral line, in failing to discover dangerous situation that such omission presented, and in conducting settlement negotiations through insurance carrier with cooperative customers who sustained fire damage was not sufficiently outrageous); *Tomash v. Deere Indus. Equip. Co.,* 399 N.W.2d 387, 392–93 (Iowa 1987) (bringing of criminal charges was reasonably appropriate and therefore not outrageous); *Reihmann,* 375 N.W.2d at 681 (claim of improperly exerting influence to transfer employee was too speculative, and transfer of employee after complaints from customers was not outrageous); *Northrup,* 372 N.W.2d at 198–99 (firing for alcoholism not outrageous in light of extensive responsibilities of plaintiff); *Bossuyt v. Osage Farmers Nat. Bank,* 360 N.W.2d 769, 777 (Iowa 1985) (bank's refusal to pay own cashier's check not outrageous); *Vinson,* 360 N.W.2d at 119 (deliberate campaign to badger and harass employee not outrageous although "petty and wrong, even malicious"); *Harsha v. State Sav. Bank,* 346 N.W.2d 791, 801 (Iowa 1984) (banker's refusal to extend credit causing creditor to default on other obligations not sufficiently outrageous to support jury verdict on emotional distress claim); *Roalson v. Chaney,* 334 N.W.2d 754, 756 (Iowa 1983) (offer to marry made to woman still married and intended for her was not outrageous conduct as to woman's husband, even if it showed poor judgment); *Amsden v. Grinnell Mut. Reinsurance Co.,* 203 N.W.2d 252, 255 (Iowa 1972) (refusal to pay fire insurance benefits during period of arson investigation to insured suspected of arson by authorities not outrageous). There are few cases in which an Iowa court actually held the conduct alleged was sufficiently outrageous. *See, e.g., Bong v. Snyder,* 361 N.W.2d 312, 315–17 (Iowa Ct.App.1984) (supervisors' excessive and groundless harassment of employee suffi-

ciently outrageous); *Randa v. U.S. Homes, Inc.,* 325 N.W.2d 905, 907–08 (Iowa Ct.App. 1982) (defective construction of home and filing of mechanic's lien so shocking as to support jury verdict for emotional distress).

The court concludes that O'Bryan has not alleged any sufficiently outrageous conduct to support his claim of intentional infliction of emotional distress. At most, his allegations are that he was demoted abruptly and his position was assumed by the associate who had recommended his demotion. He subsequently was fired after failing to meet the new performance guidelines. Whether or not the court agrees with KTIV's business decision to terminate O'Bryan, discharging an at-will employee who was not performing up to the standards required by an employer in a competitive business can hardly be considered outrageous. O'Bryan, thus, has failed as a matter of law to present evidence of outrageous conduct on the part of KTIV. The court concludes that KTIV is therefore entitled to summary judgment on O'Bryan's claim for infliction of emotional distress.

*4. Evidence of Emotional Distress.* In the alternative, the court concludes that O'Bryan's evidence of emotional distress is insufficient as a matter of law to support the claim of intentional infliction of emotional distress. The Iowa Supreme Court has established stringent standards for this element of the tort as well. In Iowa, "the law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it." *Tappe v. Iowa Methodist Medical Ctr.,* 477 N.W.2d 396, 404 (Iowa 1991) (quoting *Bethards v. Shivers, Inc.,* 355 N.W.2d 39, 44 (Iowa 1984), in turn quoting Restatement (Second) of Torts § 46, comment j (1965)). The plaintiff must prove more than the fact that he felt bad for a period of time. *Vaughn,* 459 N.W.2d at 636; *Steckelberg v. Randolph,* 448 N.W.2d 458, 461 (Iowa 1989); *Randa,* 325 N.W.2d at 908. Rather, the plaintiff must also put on proof of physical ailments that plagued him during the relevant period of time and medical evidence of the cause of these ailments. *Vaughn,* 459 N.W.2d at 636. In many cases where the Iowa Supreme Court has held that a fact question was engendered on the issue

of emotional harm and causation, the court has relied on the testimony of physicians and psychiatrists. *Id.* (citing cases).

The Iowa Supreme Court has found a variety of symptoms and combination of symptoms inadequate to support a claim of emotional distress. *See, e.g., Tappe,* 477 N.W.2d at 404 (event "worst thing" that ever happened to plaintiff, followed by symptoms of feeling upset and confused fell far short of proof necessary to sustain a *prima facie* case); *Vaughn,* 459 N.W.2d at 636 (evidence that plaintiff was upset, grouchy, nervous, and that his sex life deteriorated not sufficient); *Bates v. Allied Mut. Ins. Co.,* 467 N.W.2d 255, 261 (Iowa 1991) (evidence that plaintiff was so angry he felt physical pain, was sleepless, could only think about the event, felt cheated by the legal system and did not trust lawyers or anyone else, was haunted by fears that occupied his waking moments, interrupted his sleep, and prevented him from enjoying life was insufficient); *Bethards v. Shivvers, Inc.,* 355 N.W.2d 39, 44–45 (Iowa 1984) (one plaintiff "quivered" when the subject came up, the other worried about what other people thought, but such evidence was insufficient); *Harsha v. State Sav. Bank,* 346 N.W.2d 791, 801 (Iowa 1984) (plaintiff was depressed, not interested in life, and downhearted, but such evidence was insufficient); *Poulsen v. Russell,* 300 N.W.2d 289, 297 (Iowa 1981) (plaintiff's evidence that he was "very, very down," felt "super badly," was disappointed, and believed he had lost everything for a month or two was insufficient).

In contrast, cases in which the Iowa courts have found evidence of sufficient emotional harm have had direct evidence of either physical symptoms of the distress or a clear showing of a notably distressful mental reaction caused by the outrageous conduct. *Steckelberg,* 448 N.W.2d at 462 (citing the

following cases: *Meyer v. Nottger,* 241 N.W.2d 911, 915–16 (Iowa 1976) (plaintiff was nauseous, had difficulty breathing, and was hospitalized for acute heart spasm); *Northrup v. Miles Homes, Inc.,* 204 N.W.2d 850, 855 (Iowa 1973) (plaintiff cried frequently, lost weight, and suffered abdominal cramps); *Randa,* 325 N.W.2d 905, 908 (Iowa Ct.App. 1982) (plaintiff was hospitalized with a near nervous breakdown, fear, and shock)); *see also Wambsgans v. Price,* 274 N.W.2d 362, 366 (Iowa 1976) (although Supreme Court believed evidence of distress from loss of home was sufficient, jury had been improperly instructed and matter was remanded). Here, O'Bryan has not presented evidence of such dire symptoms. Rather, O'Bryan asserts that

> It was absolutely the most trying time of my life. I could not sleep. My wife all of a sudden had blood pressure problems and I was emotionally stressed to say the least, as was my entire family.

O'Bryan Aff. at ¶ 16. These symptoms, although uncomfortable or disconcerting, are not "so severe that no reasonable [person] could be expected to endure it." *Tappe,* 477 N.W.2d at 404.[20] Furthermore, any medical evidence of causation is entirely lacking from the summary judgment record. The court concludes that on the ground of insufficient evidence of emotional distress as well as the grounds of preemption by the Iowa Civil Rights Act and insufficient evidence of outrageous conduct, KTIV is entitled to summary judgment on O'Bryan's claim of intentional infliction of emotional distress.

### F. Wrongful Discharge in Violation of Public Policy

Similarly, KTIV moves for summary judgment on O'Bryan's claim that KTIV wrongfully discharged him in violation of public policy.[21] KTIV asserts that such a claim is

---

**20.** This is not to say that O'Bryan's symptoms would not sustain an award of damages for emotional distress should he prevail on another of his claims. *See, e.g., Oswald v. LeGrand,* 453 N.W.2d 634, 639 (Iowa 1990) (distinguishing between proof necessary for award of damages for emotional distress and proof of emotional distress to support separate tort claim); *Nesler v. Fisher & Co., Inc.,* 452 N.W.2d 191, 199 (Iowa 1990) (same); *Niblo v. Parr Mfg., Inc.,* 445 N.W.2d 351, 357 (Iowa 1989) (same); *Dickerson v. Young,* 332

N.W.2d 93, 98 (Iowa 1983) (same); *Edmunds v. Mercy Hosp.,* 503 N.W.2d 877, 881 (Iowa Ct.App. 1993).

**21.** O'Bryan fails to identify in the amended complaint exactly what public policy KTIV is alleged to have violated by its dismissal of him. In his resistance to KTIV's motion, however, he asserts that KTIV has violated public policy by retaliat-

preempted because, as a matter of law, the Iowa Civil Rights Act, Iowa Code § 216.16, provides the exclusive remedy for a claim based on sex or age discrimination.

***1. General Rule and History of Doctrine.*** The Iowa Supreme Court was slow to recognize a cause of action for the wrongful discharge of an at-will employee, instead relying on the general rule that an at-will employee may be terminated at any time, for any reason. *See Abrisz v. Pulley Freight Lines, Inc.,* 270 N.W.2d 454, 455 (Iowa 1978); *Harper v. Cedar Rapids Television Co.,* 244 N.W.2d 782, 791 (Iowa 1976); *Allen v. Highway Equip. Co.,* 239 N.W.2d 135, 139 (Iowa 1976). In *Northrup,* the court stated that

> [t]his court has never expressly recognized a public policy exception [to the employment at will doctrine], although we recently noted its increasing acceptance in other jurisdictions. [Citations omitted].
>
> While we hinted in *Abrisz* that, under proper circumstances, we would recognize a common-law claim for a discharge violating public policy, we did not apply it there because the facts did not establish such a violation. We observed, moreover, that "[c]ourts should not declare conduct violative of public policy unless it is clearly so." *Abrisz,* 270 N.W.2d at 456. It has been observed, in fact, that successful common-law claims for wrongful discharge have been based in large part on violations of independent statutory policy, not those established by court decisions. *See* Note, *Protecting At–Will Employees [Against Wrongful Discharge: The Duty to Terminate Only in Good Faith],* 93 Harv.L.Rev. at 1822–23.

*Northrup,* 372 N.W.2d at 196. The court then went on to find an express public policy prohibiting discharges for "disabilities," but held that a claim of wrongful discharge based on a disability was preempted by the exclusive remedies of Iowa Code Ch. 216. *Id.* As in *Abrisz,* the court again refused to recognize a claim of wrongful discharge in violation of public policy in *Haldeman v. Total*

*Petroleum, Inc.,* 376 N.W.2d 98 (Iowa 1985), because "we simply observe that this case would not fall into such an exception." *Id.* at 105. In *Haldeman,* the plaintiff's claim of wrongful discharge was based on her discharge as a cashier following discovery of "unexplained shortages." *Id.* In *Cross v. Lightolier Inc.,* 395 N.W.2d 844 (Iowa 1986), the Iowa Supreme Court recognized that jurisdictions were split on whether an action for wrongful discharge under a mandate of public policy is a contract or tort action. *Id.* at 849. However, the court upheld the trial court's conclusion that plaintiff's claim of breach of an oral contract was a contract and not a tort claim, and reiterated that "[e]mployment at will ... cannot be used as a basis for an action for wrongful discharge or breach of employment contract." *Id.* (quoting *Haldeman,* 376 N.W.2d at 105).

It was not until 1988 that the Iowa Supreme Court recognized a cause of action for discharge that frustrates a well-recognized and defined public policy of the state in the case of *Springer v. Weeks & Leo Co., Inc.,* 429 N.W.2d 558, 560 (Iowa 1988) (hereinafter *Springer I* ).[22] However, the court considered the cause of action to be one of tortious interference with a contract of hire. *Springer I,* 429 N.W.2d at 560. The court later concluded that this characterization "may have been misleading," and cited cases clarifying the court's development and refinement of the tort. *Springer v. Weeks & Leo Co., Inc.,* 475 N.W.2d 630, 632–33 (Iowa 1991) (hereinafter *Springer II* ). The Iowa Supreme Court has construed *Springer I* as holding that if the discharge of an employee at will is in violation of public policy, the employee has a cause of action in tort against the employer. *Smith v. Smithway Motor Xpress, Inc.,* 464 N.W.2d 682, 685 (Iowa 1990); *see also Vaughn,* 459 N.W.2d at 637 (Iowa 1990) (in *Springer I,* "the court recognized an at-will employee's right to compensation for wrongful discharge in violation of a 'clearly articulated public policy of this state' "); *Fogel v. Trustees of Iowa College,*

---

ing against him for exercising his right to file a claim with the Iowa Civil Rights Commission.

**22.** The *Springer I* opinion cites no fewer than thirteen other states that had judicially recognized the public policy exception to employment at-will.

446 N.W.2d 451, 455 (Iowa 1989) (citing *Springer I* for the same proposition).

▮ As the law now stands in Iowa, the general rule is still that an at-will employee may be discharged at any time, for any reason, or no reason at all. *Borschel v. City of Perry*, 512 N.W.2d 565, 566 (Iowa 1994); *Lara v. Thomas*, 512 N.W.2d 777, 781 (Iowa 1994); *French v. Foods, Inc.*, 495 N.W.2d 768, 769 (Iowa 1993); *Grahek*, 473 N.W.2d at 34; *Fogel*, 446 N.W.2d at 455. The court has recognized two exceptions to this general rule in which a cause of action for wrongful discharge of an at-will employee will lie: The first is where the discharge is in clear violation of a "well-recognized and defined public policy of this state," and the second is where a contract is created by an employer's handbook or policy manual. *Borschel*, 512 N.W.2d at 566; *French*, 495 N.W.2d at 769–70; *Fogel*, 446 N.W.2d at 455; *see also Lara*, 512 N.W.2d at 782 (case involved "one of the exceptions," discharge in violation of public policy); *Grahek*, 473 N.W.2d at 34 ("termination of an employment at-will is generally not actionable in the absence of discrimination or a public policy violation."); *Vaughn*, 459 N.W.2d at 638 (public policy exception only discussed); *Niblo v. Park Mfg., Inc.*, 445 N.W.2d 351, 355 (Iowa 1989) (public policy exception only discussed). The public policy exception is based on the theory that the law should not allow employees to be fired for reasons that violate public policy. *Borschel*, 512 N.W.2d at 567 (citing 82 Am.Jr.2d, *Wrongful Discharge* § 15, at 687 (1992)).

▮ Under the public policy exception, the Iowa Supreme Court has recognized causes of action for tortious discharge where an employer's retaliatory discharge would conflict with certain legislatively declared goals. *Lara*, 512 N.W.2d at 782. Such policies may be expressed in the constitution and the statutes of the state, *Borschel*, 512 N.W.2d at 567 (citing 82 Am.Jr.2d, *Wrongful Discharge* § 19, at 692 (1992)), although enforcement of the tort based on some policies is preempted by enforcement under the statutes embodying those policies themselves:

The legislature may explicitly prohibit the discharge of an employee who acts in accordance with a statutory right or duty.

*See, e.g.*, Iowa Code ch. 216 (1993) (civil rights statute transferred from Iowa Code ch. 601A). Discharge of an employee because of age, race, creed, color, sex, national origin, religion, or disability is an unfair employment practice. Iowa Code § 216.6. Remedies are provided employees who are discharged in violation of the statute. *See* Iowa Code § 216.15. Our civil rights statute, however, preempts an employee's claim that the discharge was in violation of public policy when the claim is premised on discriminatory acts. *Hamilton v. First Baptist Elderly Hous. Found*, 436 N.W.2d 336, 341–42 (Iowa 1989).

*Borschel*, 512 N.W.2d at 567–68. The *Borschel* court then identified the circumstances in which Iowa courts had found a public policy basis for the tort:

In the absence of an express prohibition, the court of appeals found an implied cause of action for wrongful termination when the reason for discharge is the employee's failure or refusal to violate a law in the course of employment. *Wilcox v. Hy–Vee Food Stores, Inc.*, 458 N.W.2d 870, 872 (Iowa App.1990). The court of appeals found that the violation of a statute prohibiting an employer from requiring an employee to take a polygraph examination was a violation of public policy, thus a private cause of action existed. *Id.* at 872. At the time the claim arose the statute did not expressly allow for a cause of action. This statute was later amended to so provide. *Id.*

Also we have found an implied prohibition against retaliatory discharge based on an employee's exercise of a right conferred by a clearly articulated legislative enactment. *See Lara v. Thomas*, 512 N.W.2d 777, 780 (Iowa 1994) (discharge in retaliation for filing partial unemployment claim); *Niblo v. Parr Mfg., Inc.*, 445 N.W.2d 351, 353 (Iowa 1989) (employee discharged because she threatened to file a workers' compensation claim); *Springer [I]*, 429 N.W.2d at 560 (cause of action exists when the employee's discharge serves to frustrate the public policy expressed in the workers' compensation statute).

*Borschel,* 512 N.W.2d at 568. A wrongful or retaliatory discharge in violation of public policy is therefore an intentional wrong committed by the employer against an employee who chooses to exercise some substantial right. *Niblo v. Parr Mfg., Inc.,* 445 N.W.2d 351, 355 (Iowa 1989) (citing *Perks v. Firestone Tire & Rubber Co.,* 611 F.2d 1363, 1366 (3d Cir.1979)). The remedy for the tort should be for the employee's complete injury, including out-of-pocket loss of income and causally connected emotional harm. *Id.*

[redacted] ***2. Preemption by Iowa Civil Rights Act.*** On the question of whether the Iowa Civil Rights Act provides the exclusive remedy for a claim based on age or sex discrimination so as to preempt a common law claim of violation of public policy, the Iowa Supreme Court has spoken clearly, definitively, and unequivocally:

> To be actionable, the discharge must be in violation of a clearly expressed public policy. *Springer,* 429 N.W.2d at 560. The legislature may explicitly prohibit the discharge of an employee who acts in accordance with a statutory right or duty. *See, e.g.,* Iowa Code ch. 216 (1993) (civil rights statute transferred from Iowa Code ch. 601A). Discharge of an employee because of age, race, creed, color, sex, national origin, religion, or disability is an unfair employment practice. Iowa Code § 216.6. Remedies are provided employees who are discharged in violation of the statute. *See* Iowa Code § 216.15. *Our civil rights statute, however, preempts an employee's claim that the discharge was in violation of public policy when the claim is premised on discriminatory acts.*

*Borschel,* 512 N.W.2d at 567–68 (emphasis added); *see also Hamilton,* 436 N.W.2d at 341–32. Under this line of authority, O'Bryan's claim for wrongful discharge in violation of Iowa public policy must fail as being preempted by Iowa Code Chapter 216. Therefore, the court shall grant this portion of KTIV's motion and dismiss O'Bryan's claim for wrongful discharge in violation of Iowa Public Policy.

### *G. Defamation and False Light Claims*

KTIV next challenges O'Bryan's defamation and false light claims on the grounds that O'Bryan has been unable to identify any such statements. KTIV disputes this assertion and points the court toward portions of his deposition. However, before addressing the factual contentions of the parties, the court will review the legal standards by which such claims are determined under Iowa law.

[redacted] As noted above in the court's discussion regarding invasion of privacy, the Iowa Supreme Court has adopted the Restatement principles found in § 652A. Section 652A states as follows:

> (1) One who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other.
>
> (2) The right of privacy is invaded by
>
> (a) unreasonable intrusion upon the seclusion of another, as stated in § 652B; or
>
> (b) appropriation of the other's name, or likeness, as stated in § 652C; or
>
> (c) unreasonable publicity given to the other's private life, as stated in § 652D; or
>
> (d) publicity that unreasonably places the other in a false light before the public, as stated in § 652E.

*Winegard,* 260 N.W.2d at 822. Category 2(d) is controlled by section 652E, *see id.,* which provides that:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652E. "This category overlaps the law of defamation." *Winegard,* 260 N.W.2d at 823.

The law of defamation consists of the twin torts of libel and slander. W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 111, at 771 (5th ed. 1984) [herein-

after Prosser & Keeton]. The gist of an action for libel or slander is the publication of written or oral statements which tend to injure a person's reputation and good name. *Id.* at 773. Slander generally consists of the oral publication of defamatory matter. *See* Restatement (Second) of Torts § 568 (1976).

*Lara v. Thomas,* 512 N.W.2d 777, 785 (Iowa 1994). In order to prevail under Iowa law in an action for slander, O'Bryan must prove either that the published statement was slanderous per se or that the publication caused actual harm to his reputation. *Id.* "Statements which are actionable without proof of malice, falsity, or special harm fall within the category of slander 'per se.'" *Id.; see Spencer v. Spencer,* 479 N.W.2d 293, 296 (Iowa 1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 120, 121 L.Ed.2d 76 (1992); *Vinson,* 360 N.W.2d at 115–16. "Words are libelous per se if they are of such a nature, whether true or not, that the court can presume as a matter of law that their publication will have libelous effect." *Vinson,* 360 N.W.2d at 115 (citing *Haas v. Evening Democrat Co.,* 252 Iowa 517, 522, 107 N.W.2d 444, 447 (1961)). "Slanderous imputations affecting a person in his or her business, trade, profession, or office are also actionable without proof of actual harm." *Id.* Where the language of the publication is unambiguous, the issue of whether the publication is defamatory per se is for the court. *Id.* at 116.

▮▮▮ Turning to the facts of this case, O'Bryan points to the following statement, among others, in his deposition as supporting his claim that KTIV made slanderous statements toward him:

Q. What did your son-in-law tell you Bill Turner told him?

A. I don't know that I can specifically remember at this time, but that I was having some kind of problem functioning in my job and that he was getting a lot of pressure from Quincy and so on [sic] on my performance.

O'Bryan Dep. at 115.[23] The court concludes that this statement is insufficient as a matter of law to constitute defamation per se. First, it must be recognized that mere publication of an employee's demotion is not itself defamatory. *See Davis v. Ross,* 754 F.2d 80, 84 (2d Cir.1985) (merely stating that employee was terminated is not defamatory); *Zechman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 742 F.Supp. 1359, 1371 (N.D.Ill.1990) (holding that mere publication of an employee's termination is not itself defamatory). Furthermore, the statement in question lacks sufficient precision and specificity to be defamatory. *See McGrath v. TCF Bank Savings, fsb,* 502 N.W.2d 801, 808 (Minn.Ct.App.) (calling employee a "troublemaker" was not defamatory because it lacked precision and specificity), *modified on other grounds,* 509 N.W.2d 365 (Minn.1993). In *Schibursky v. IBM Corp.,* 820 F.Supp. 1169, 1181 (D.Minn. 1993), the district court held that statements that the plaintiff was "hard to work with" or "rude" were too imprecise to be actionable. In the case at hand, KTIV's publishing that O'Bryan was having some type of trouble at work does not clearly reflect on O'Bryan's fitness to perform his position at KTIV. It must be noted that while O'Bryan had the opportunity to produce, through affidavits, statements of those individuals who he alleges heard the published statements in order to clarify what published statements were made by KTIV employees, he has failed to do so.

A comparison with statements regarding conduct of employees found to be slanderous per se reveals that the statement attributed to KTIV falls far short of constituting such a statement. In *Lara v. Thomas,* 512 N.W.2d 777, 785 (Iowa 1994), the plaintiff's employer made inquiries as to whether she had a "drug problem." The Iowa Supreme Court found that such inquiries could be found to be per se actionable because "[t]he imputation of

---

**23.** Portions of O'Bryan's deposition are attached to Plaintiff's Appendix as exhibit 18. In reference to a statement allegedly made to O'Bryan's friend, Charlie Zook, O'Bryan stated in his deposition that:

A: *I don't know exactly what he told him.* The indication that I got, it was that he—that I could no longer function and he needed to make a change, that things just weren't going well. It wasn't just a restructure where I'm going to be over here instead of over there. It was a flat demotion.

O'Bryan Aff. at 113 (emphasis added).

substance abuse clearly reflects on [the plaintiff's] capacity and fitness to perform the duties of a veterinary assistant." *Id.* at 785; *see Meehan v. Amax Oil & Gas, Inc.,* 796 F.Supp. 461, 466 (D.Col.1987) (holding that statements that the plaintiff had done a "bad job or terrible job" in his position and that defendants had discussions concerning plaintiff's "inadequacies" were slanderous per se); *Girsberger v. Kresz,* 261 Ill.App.3d 398, 412, 198 Ill.Dec. 940, 952, 633 N.E.2d 781, 793 (1993) (holding that statement that employee was guilty of misconduct and malfeasance was defamatory). Similarly, the Iowa Supreme Court has held that statements concerning the honesty of an employee may be libel per se. In *Vinson,* the Iowa Supreme Court held that an employer's statements that plaintiff had falsified time cards were libel per se. *Vinson,* 360 N.W.2d at 115. The statement identified here, on the other hand, does not reflect upon O'Bryan's honesty, or capacity to perform his job at KTIV. Rather, it only reveals that O'Bryan was having some unidentified problem at work. The severity or nature of the problem is not revealed in the statement, and O'Bryan has taken no action to provide the court with the text of the actual statement. Therefore, finding the statement identified by O'Bryan not to be slanderous per se, the court shall grant this portion of KTIV's Motion for Summary Judgement.

### H. Sex and Age Discrimination Claims

**1. Burdens of Proof Under the ADEA.** Under the ADEA, a plaintiff may establish age discrimination "by either direct or indirect methods of proof." *Beshears v. Asbill,* 930 F.2d 1348, 1353 (8th Cir.1991); *see Blake v. J.C. Penney Co., Inc.,* 894 F.2d 274, 278 (8th Cir.1990). "The allocation of burden of proof in ADEA cases ... depends on whether a case is characterized as a 'pretext' case or as a 'mixed-motive' case." *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 447 (8th Cir.1993). Here, the court is confronted with a pretext case.

In a pretext case "either a legitimate or illegitimate set of considerations led to the challenged decision." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 247, 109 S.Ct. 1775, 1789, 104 L.Ed.2d 268 (1989); *Radabaugh,* 997 F.2d at 447.[24] In a pretext case, the plaintiff carries the burden of establishing a *prima facie* case of discrimination utilizing the basic tripartite pattern of proof (*prima facie* case-rebuttal-pretext) as set forth in the *McDonnell Douglas–Burdine* framework.[25] *Beshears v. Asbill,* 930 F.2d 1348, 1353 (8th Cir.1991); *see Gaworski v. ITT Commercial Fin. Corp.,* 17 F.3d 1104, 1108 (8th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 355, 130 L.Ed. 310 (1994). Thus, O'Bryan may establish a *prima facie* case by establishing that (1) he was within the protected age group; (2) he was performing his job at a level that met his employer's legitimate expectations; (3) he was discharged; and (4) his employer attempted to replace him. *Radabaugh,* 997 F.2d at 447; *Beshears,* 930 F.2d at 1353; *Raschick v. Prudent Supply, Inc.,* 830 F.2d 1497, 1499 (8th Cir.

**24.** Mixed-motive cases, however, arise when the plaintiff establishes that an employment decision was "the product of a mixture of legitimate and illegitimate motives." *Price Waterhouse,* 490 U.S. at 247, 109 S.Ct. at 1788; *Radabaugh,* 997 F.2d at 448. "In a mixed motive case, the plaintiff has initial burden of proving that an illegitimate factor was a motivating factor in an employment decision adverse to the plaintiff." *Radabaugh,* 997 F.2d at 448 (citing *Beshears v. Asbill,* 930 F.2d 1348, 1353 (8th Cir.1991)). "Once a plaintiff has made this initial showing, the burden shifts to the employer to prove that it would have made the same decision even if it had not taken the illegitimate factor into account." *Id.*

**25.** *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973),

and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Although the action in *McDonnell Douglas* was brought under Title VII, the United States Court of Appeals for the Eighth Circuit "routinely applies the *McDonnell Douglas* approach in ADEA cases." *Beshears,* 930 F.2d at 1353 n. 7; *Hase v. Missouri Div. of Employment Sec.,* 972 F.2d 893, 896 (8th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2332, 124 L.Ed.2d 244 (1993); *Halsell v. Kimberly–Clark Corp.,* 683 F.2d 285, 289 (8th Cir.1982), *cert. denied,* 459 U.S. 1205, 103 S.Ct. 1194, 75 L.Ed.2d 438 (1983); *Tribble v. Westinghouse Elec. Corp.,* 669 F.2d 1193, 1196 (8th Cir.1982), *cert. denied,* 460 U.S. 1080, 103 S.Ct. 1767, 76 L.Ed.2d 342 (1983).

1987), *cert. denied,* 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988). Once O'Bryan establishes a *prima facie* case, the burden then shifts to KTIV to articulate a legitimate nondiscriminatory reason for its actions. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254–55, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981); *Radabaugh,* 997 F.2d at 448; *Beshears,* 930 F.2d at 1353. O'Bryan then has the opportunity to prove by a preponderance of the evidence that his employer's articulated legitimate nondiscriminatory reasons for its action are pretextual and that he has, in fact, been a victim of intentional discrimination. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *Radabaugh,* 997 F.2d at 448; *McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. at 1824–25; *Beshears,* 930 F.2d at 1353. The plaintiff retains the burden of persuasion at all times. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *Beshears,* 930 F.2d at 1353.

**2. Prima Facie Case.** KTIV initially asserts that because O'Bryan was not meeting the executive performance guidelines he cannot make out a *prima facie* case. O'Bryan, however, asserts that an issue of material fact has been generated regarding the level of his performance. Although the court views this as a close question, the court concludes that upon application of this standard here, O'Bryan is able to prove a *prima facie* case of age discrimination. There can be no question that O'Bryan, age 58, is a member of the protected class; and that he was terminated by KTIV. Thus, two prongs of the *McDonnell Douglas* test have been satisfied here. However, KTIV contends that O'Bryan is unable to prove the third prong of the *McDonnell Douglas* test, that he was qualified for the position. For the third element of the *McDonnell Douglas prima facie* test, O'Bryan must establish that he was performing his job at a level that met his employer's legitimate expectations. *See Halsell v. Kimberly–Clark Corp.,* 683 F.2d 285 (8th Cir.1982), *cert. denied,* 459 U.S. 1205, 103 S.Ct. 1194, 75 L.Ed.2d 438 (1983). O'Bryan asserts that he meets this element of the *McDonnell Douglas* test through his sales performance.

This job performance element of the *McDonnell Douglas* test has been defined in terms of whether the employee was doing the job well enough to " 'meet[ ] his employer's legitimate expectations.' " *Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.) (quoting *Huhn v. Koehring Co.,* 718 F.2d 239, 244 (7th Cir. 1983)), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). With respect to an employer's legitimate expectations, the Second Circuit has instructed in *Meiri* that:

> "[a]lthough courts must refrain from intruding into an employer's policy apparatus or second-guessing a business's decision-making process, ..., they must also allow employees 'to show that the employer's demands were illegitimate or arbitrary.' "

*Id.* (citation omitted) (quoting *Kephart v. Institute of Gas Technology,* 630 F.2d 1217, 1223 (7th Cir.1980). These expectations must be legitimate. *Id.; Dale v. Chicago Tribune Co.,* 797 F.2d 458, 463 (7th Cir.1986), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987). Thus, the employer cannot establish an employee as unqualified by setting unrealistic standards. *Dale,* 797 F.2d at 463 n. 3.

Here, as in *Meiri,* O'Bryan challenges the legitimacy of his employer's expectations. O'Bryan points out that he was successful in 1992, before his demotion, in meeting his planned budget. He also points out that his replacement, Wisner, did not meet budget in 1992, but was promoted nonetheless while he was demoted. He further points to the fact that after his demotion and reassignment to the position of account executive he was given a number of accounts with budgets that were preset by Wisner. He alleges that these account budgets were set unrealistically high. Given the fact that KTIV attacks O'Bryan's ability to demonstrate that its stated reason for firing him was pretextual, the court will assume for the sake of argument that O'Bryan has generated a material fact question on the question of his establishing a *prima facie* case.[26] *See id.* at 996–97; *see*

---

**26.** The court notes that neither party has placed in record the individual sales records of KTIV's sales staff for the months of January through July, 1993. Therefore, no comparison may prop-

*also Reich v. New York Hosp.*, 513 F.Supp. 854, 860 (S.D.N.Y.1981) (stating that plaintiff should be permitted to question the legitimacy of her employer's expectations where she came forth with proof that the employer's demands may have been unrealistic).

**3. Pretext for Discrimination.** KTIV next asserts that it has articulated sufficient non-discriminatory reasons to sustain its burden in responding to O'Bryan's *prima facie* case. KTIV has submitted the affidavits of Wisner, Turner and Cleaver, as well as the text of meetings the three had with O'Bryan to discuss his performance. These submissions support its assertion that O'Bryan was terminated for constantly failing to meet the executive performance guidelines, and not taking affirmative steps to improve his performance. These facts militate against a finding of discrimination, and

adequately respond to O'Bryan's *prima facie* case. KTIV thus asserts that because it has met its burden of production, the burden now shifts back to O'Bryan to demonstrate that the nondiscriminatory reason it advanced was pretextual in nature. *See Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–94. Where, as here, an employer raises a nondiscriminatory reason for discharging an employee, that employee must either raise an issue of material fact as to the pretextual nature of the proffered reasons or persuade the court that a discriminatory motive more likely motivated the employer's actions. *Id.* at 256, 101 S.Ct. at 1095. Because O'Bryan has presented no direct evidence of intentional discrimination, the critical summary judgment inquiry here is whether he has been able to come forward with sufficient evidence that KTIV's nondiscriminatory reason is pretextual.[27] In other

---

erly be made of O'Bryan's sales performance with that of the other sales staff.

**27.** The only direct evidence O'Bryan points to is statements allegedly made by Wisner that O'Bryan was part of the "good old boy network." The court characterizes Wisner's statements as being nothing more than "stray remarks." The stray remarks doctrine has its genesis in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), wherein Justice O'Connor stated in her concurring opinion that "stray remarks in the workplace—cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria." *Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. at 1804. Comments suggesting that the employer may have considered impermissible factors are often relevant to a disparate treatment claim. *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438 (9th Cir.1990). "On the other hand 'stray' remarks are insufficient to establish discrimination." *Id.* (citing *Price Waterhouse*, 490 U.S. 228, 251, 277 and 280, 109 S.Ct. 1775, 1791, 1804–05 and 1806–07 (1989)). Numerous decisions have held that specific statements of employees are "stray remarks" and, thus, not evidence of discrimination. *See e.g., Turner v. North American Rubber, Inc.*, 979 F.2d 55, 58–59 (5th Cir.1992) (finding that reference by boss to "three young tigers" being sent to assist plaintiff more than one year before his discharge was not related to plaintiff's age or his discharge); *Guthrie v. Tifco Indus.*, 941 F.2d 374, 378–79 (5th Cir.1991) (holding that comment by retired president of corporation that his son who succeeded him would "need to surround himself with people his age" was a stray remark because of the vagueness, remoteness in time and administrative hierarchy to personnel decision), *cert. denied*

*sub nom., Guthrie ex. rel. Guthrie v. Tifco Indus.*, —— U.S. ——, 112 S.Ct. 1267, 117 L.Ed.2d 495 (1992); *Merrick*, 892 F.2d at 1438–39 (remark by decision maker that he chose another individual over plaintiff because the other individual was "a bright, intelligent, knowledgeable young man," is a stray remark); *Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 314–16 (6th Cir.1989) (finding that a "single, isolated discriminatory comment" by plaintiff's immediate supervisor was insufficient to trigger burden shift or to avoid summary judgment for defendant); *Smith v. Firestone Tire & Rubber Co.*, 875 F.2d 1325, 1330 (7th Cir. 1989) (noting that stray "remarks, . . . when unrelated to the decisional process, are insufficient to demonstrate that the employer relied on illegitimate criteria even when such statements are made by the decision maker in issue.").

There appears to be no unified test for determining whether certain statements fall within the stray remarks doctrine. Rather, as the above cases demonstrate, courts look to the relationship between the remarks and the decisional process, the age-based substance of the statements, the specificity of the statements both with regard to the actual employment decision at issue such as hiring, promotion or termination, as well as the relationship to the remark and the plaintiff's situation, and remoteness in time to the personnel decision. Several recent decisions from the United States Court of Appeals for the Eighth Circuit, *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444 (8th Cir.1993); *Kehoe v. Anheuser-Busch, Inc.*, 995 F.2d 117 (8th Cir.1993); *Frieze v. Boatmen's Bank of Belton*, 950 F.2d 538, 541–42 (8th Cir.1991); *Beshears v. Asbill*, 930 F.2d 1348 (8th Cir.1991); *Blake v. J.C. Penney Co., Inc.*, 894 F.2d 274, 276–78 (8th Cir.1990), substantially assist in defining the contours of the

words, that KTIV proffered reason is "unworthy of credence" to permit the trier of fact to find that a discriminatory or retaliatory reason motivated KTIV's discharge of O'Bryan. As the United States Supreme Court has pointed out, this is the critical inquiry:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the *prima facie* case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons, will *permit* the trier of fact to infer the ultimate fact of intentional discrimination. . . .

*St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993) (emphasis in original); *see also Gaworski,* 17 F.3d at 1109–10.

In opposing KTIV's Motion for Summary Judgment, O'Bryan asserts that he was performing his position in a satisfactory manner, that the new executive performance guidelines were applied only to him, and that other salespersons at KTIV failed to meet their budget projections, but were retained. The problem herein lies with the fact that O'Bryan relies upon his own self-serving statements in his affidavit to support each of these propositions. Clearly, however, such conclusory, self-serving statements, standing alone, are insufficient to establish that plaintiff performed his job satisfactorily, especially given the well documented evidence to the contrary. *Thermidor v. Beth Israel Medical Ctr.,* 683 F.Supp. 403, 412–13 (S.D.N.Y.1988) (holding that plaintiff failed to provide evidence sufficient to show that he performed his job satisfactorily where the only evidence proffered consisted of mere conclusory allegations); *see Schibursky,* 820 F.Supp. at 1178 (holding that plaintiff's subjective beliefs and bare allegations fell far short of demonstrating that age was a determining factor in her discharge); *see also Dunavant v. Moore,* 907 F.2d 77, 80 (8th Cir.1990); *Leidig v. Honeywell, Inc.,* 850 F.Supp. 796, 799 n. 1 (D.Minn.1994); *Richardson v. Oldham,* 12 F.3d 1373, 1378 (5th Cir.1994); *Travelers Ins. Co. v. Liljeberg Enter., Inc.,* 7 F.3d 1203, 1206 (5th Cir.1993); *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 585–86 (6th Cir. 1992); *O'Shea v. Detroit News,* 887 F.2d 683, 688 (6th Cir.1989); *Laurence v. Chevron, U.S.A., Inc.,* 885 F.2d 280, 285 (5th Cir.1989). Although O'Bryan has submitted sales documents for other salespersons, the court notes that these documents relate to 1992 sales, not 1993 sales. On the other hand, Defendants have well documented the meetings O'Bryan had with Wisner, Turner and Cleaver over his failure to meet the guidelines. O'Bryan has not rebutted nor in any way contradicted the factual accuracy of Defendants' submissions on these points.

Therefore, the court finds that O'Bryan's proffered evidence fails to create a genuine issue of material fact as to KTIV's stated reason for terminating O'Bryan's employment.[28] KTIV is entitled to summary judgment herein because this court may not second guess its business judgment in deciding to terminate O'Bryan based on his inadequate job performance. The Eighth Circuit has held that the intent of the ADEA is not to review the correctness of employer's business decisions, *Bell v. Gas Serv. Co.,* 778 F.2d 512, 515 (8th Cir.1985), and that "courts have no business telling [the employer] how to make personnel decisions, which may be objectively or subjectively based." *Neufeld v.*

---

stray remarks doctrine in our circuit. *See generally Holmes v. Marriott Corp.,* 831 F.Supp. 691, 705 (S.D.Iowa 1993) (providing synopses of Eighth Circuit holdings).

Upon analyzing the statements at issue the court finds that they constitute stray remarks and thus lack probative value in establishing discriminatory intent. It is at once evident that the phrase "old boy network" does not necessarily refer to the age of the individuals involved, but to a type of association enjoyed by the individuals. As a result, the mere fact that one refers to another as belonging to such an association does not reflect upon the age of the individual involved.

**28.** Similarly, the court finds that O'Bryan has not generated a material fact question as to KTIV's stated reason for his demotion. Although O'Bryan repeatedly points out in his memorandum in resistance to KTIV's motion that he met the 1992 sales budget, his proffered evidence does not create a genuine issue of material fact regarding KTIV's stated reasons for his demotion. The court shall, therefore, grant summary judgment against O'Bryan on his demotion claim.

*Searle Lab.*, 884 F.2d 335, 340 (8th Cir.1989). Thus, because O'Bryan is "unable to show evidence from which a jury could infer discrimination, ..., then summary judgment may be granted." *Diamantopulos v. Brookside Corp.*, 683 F.Supp. 322, 328 (D.Conn. 1988) (citations omitted).

#### 4. Sex Discrimination Claims

O'Bryan also alleges that KTIV unlawfully discriminated against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* As noted above, Title VII claims, like O'Bryan's ADEA claims, are governed by the *McDonnell Douglas* analysis. O'Bryan has offered no additional evidence on this claim which would cause the court to reach a different result than that reached above with respect to O'Bryan's ADEA claim.[29] Therefore, KTIV's motion shall be granted as to O'Bryan's Title VII claims.[30]

#### I. Retaliation Claims

**1. Prima Facie Case.** Finally, KTIV seeks summary judgment on O'Bryan's claims for retaliatory discharge.[31] "Proving retaliation claims under the ADEA follows the same general approach taken to similar claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3." [32] *Wentz v. Maryland Casualty Co.*, 869 F.2d 1153, 1154 (8th Cir.1989) (citing *Anderson v. Phillips Petroleum Co.*, 861 F.2d 631, 634 (10th Cir.1988)). As the Eighth Circuit pointed out in *Wentz:*

> To establish a *prima facie* case of retaliatory discharge in violation of the ADEA, Wentz must show: (1) he engaged in conduct protected under the ADEA; (2) he was subjected to an adverse employment action at the time of, or after, the protected conduct occurred; and (3) there was a causal link between the protected activity and the adverse employment action. *See id.; see also Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir.1980) (Title VII claim for retaliatory discharge), *cert. denied*, 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981).

*Id; see Evans v. Pugh*, 902 F.2d 689, 693 (8th Cir.1990) (citing *Wentz*|). The Eighth Circuit Court of Appeals has applied this three-prong *prima facie* showing in a variety of employment retaliation cases. *See, e.g. Reich v. Hoy Shoe Co.*, 32 F.3d 361, 365 (8th Cir.1994) (three-prong *prima facie* showing of retaliation for reporting violations to OSHA); *Schweiss v. Chrysler Motors Corp.*, 987 F.2d 548, 549 (8th Cir.1993) (OSHA retaliatory firing case); *Rath v. Selection Research, Inc.*, 978 F.2d 1087, 1090 (8th Cir. 1992) (same three-prong showing in ERISA

---

**29.** Indeed, the only additional evidence proffered by O'Bryan in support of his Title VII claim is a purported statement by Turner that "[t]hese young women have their own network." As with the phrase "old boys network", *see* supra note 27, the court finds that this phrase is but a stray remark and thus lacks any probative value in establishing discriminatory intent.

**30.** O'Bryan also asserts that he can meet the requirements of a mixed-motive case. However, the court finds that because O'Bryan has failed to produce direct evidence that age or sex was a factor in his dismissal, he has failed to satisfy the threshold requirement set out in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 247, 109 S.Ct. 1775, 1788–89, 104 L.Ed.2d 268 (1989). Therefore, "[i]f the plaintiff has failed to satisfy the *Price Waterhouse* threshold, the case should be decided under the principles enunciated in *McDonnell Douglas* and *Burdine....*" *Radabaugh*, 997 F.2d at 448; *see Beshears*, 930 F.2d at 1353.

**31.** The court construes KTIV's motion as one for summary judgment on both O'Bryan's claims for retaliatory discharge under the Iowa Code and

the ADEA. The court does so even though KTIV cites no federal case law in support of their arguments on this issue, and employ a heading which states "Retaliation in Violation of The Iowa Civil Rights Act." The court construes KTIV's motion as attacking both retaliatory discharge claims because KTIV makes specific reference to O'Bryan's second cause of action. His second cause of action is one for retaliatory discharge in violation of the ADEA.

**32.** The ADEA prohibits retaliation against persons who bring claims of age discrimination. Section 623(d) provides that:

> It shall be unlawful for an employer to discriminate against any of his employees ... because such individual ... has opposed any practice made unlawful by this section, or because such individual ... has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

29 U.S.C. § 623(d).

retaliation case); *Valdez v. Mercy Hosp.*, 961 F.2d 1401, 1403 (8th Cir.1992) (same showing in case alleging retaliatory discharge for filing Title VII race discrimination claim); *Tart v. Levi Strauss and Co.*, 864 F.2d 615, 617 (8th Cir.1988) (same showing in case alleging retaliation for filing a sex discrimination claim with the EEOC); *Jackson v. Missouri Pac. R.R. Co.*, 803 F.2d 401, 406–07 (8th Cir.1986) (same showing for retaliation for filing race discrimination claims under § 1981 and § 2000e); *Benson v. Little Rock Hilton Inn*, 742 F.2d 414, 416 (8th Cir.1984) (retaliation claims brought under § 1981 require same three-prong *prima facie* showing as those brought under Title VII); *Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir. 1980), (same showing in case alleging retaliation for filing a Title VII complaint of race discrimination), *cert. denied*, 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981).[33]

■ Once the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the employer to produce some legitimate nondiscriminatory reason for the adverse employment decision. *McDaniel v. Temple Indep. Sch. Dist.*, 770 F.2d 1340, 1346 (5th Cir.1985). If the employer meets this burden, the plaintiff must then prove that the proffered reason is a pretext for retaliation. *Id.* A plaintiff must ultimately establish that the employer's retaliatory motive was a "but for" cause of the adverse employment decision. *See Wentz*, 869 F.2d at 1155 (Wollman, J. concurring).

■ Here, KTIV contends that O'Bryan is unable to show a causal connection between the adverse employment decision and his filing of a charge of discrimination. The third prong of the showing, however, may be met, for example, by " 'proof that the discharge followed the protected activity so closely in time as to justify an inference of retaliatory motive.' " *Schweiss*, 987 F.2d at 549 (quoting *Rath*, 978 F.2d at 1090) (discharge followed report to OSHA by only four days); *see also Rath*, 978 F.2d at 1090 (stating standard, but expressing doubt that discharge six months after alleged whistle-blowing met causal connection requirement); *Couty v. Dole*, 886 F.2d 147, 148 (8th Cir. 1989) (discharge thirty days after protected activity was sufficient temporal proximity for causal connection); *Keys v. Lutheran Family and Children's Serv. of Missouri*, 668 F.2d 356, 358 (8th Cir.1981) (less than two months sufficient proximity for causal connection); *Womack*, 619 F.2d at 1296 (twenty-three days sufficient proximity for causal connection). O'Bryan has demonstrated a temporal proximity between his filing of charges with the Iowa Civil Rights Commission and the adverse employment actions taken by KTIV. Therefore, the court concludes that O'Bryan has established, at minimum, a genuine issue of material fact on the elements of his *prima facie* case of retaliation.

■ *2. Pretext for Retaliation.* O'Bryan has established a genuine issue of material fact on the elements of his *prima facie* case of retaliation. However, because Defendants have articulated a legitimate, nondiscriminatory reason for their actions, namely that O'Bryan's termination was due to his performance, O'Bryan must prove that the proffered reason was pretextual. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. As noted above, KTIV has offered affidavits from Wisner, Turner and Cleaver, as well as the text of the meetings the three had with O'Bryan to discuss his performance. O'Bryan's response is to offer only the timing of his being placed on probation and his firing. He has failed to submit anything which would undermine KTIV's stated rea-

---

**33.** Similarly, the Iowa Supreme Court has pointed out that

To prove a *prima facie* case of retaliatory discharge, a civil rights complainant must prove (1) involvement in statutorily protected activity, (2) adverse employment action, and (3) a causal connection between the two. We derived this three-factor test from federal decisions involving comparable provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. sections 2000e to 2000e–3.

*Hulme v. Barrett*, 480 N.W.2d 40, 42 (Iowa 1992) (citation omitted). Because the Iowa standard for addressing retaliatory discharge claims is identical to that employed in the Eighth Circuit in addressing retaliatory discharge claims under the ADEA, it is unnecessary for the court to distinguish between O'Bryan's pendent Iowa state law claim and his federal claim under the ADEA.

sons for terminating him. In *Schweiss,* wherein an employee brought an action alleging retaliatory firing for reporting OSHA violations, under facts on all four with this case, the Eighth Circuit held that merely offering evidence concerning the timing of the employee's firing while sufficient to generate a *prima facie* case was insufficient to undermine the employer's stated reason, job performance, for the employee's termination:

> The trial court found, and we agree, that Ms. Schweiss's affidavit is insufficient as a matter of law to create a genuine issue of material fact on the question of motive. She offers no evidence of retaliatory motive other than the timing of her firing, and she offers nothing to undermine the overwhelming evidence offered by Chrysler in support of a legitimate reason for her firing. Under these circumstances, the trial court was correct in holding that Chrysler was entitled to summary judgment.

*Schweiss,* 987 F.2d at 550; *see also Rath,* 978 F.2d at 1090; *Armstrong v. City of Dallas,* 997 F.2d 62, 67 (5th Cir.1993) (holding in Title VII action that temporal proximity of employer's action to employee's filing of complaint did not support a finding that employer's legitimate, nondiscriminatory reasons for its actions were pretextual). The Court concludes that O'Bryan's failure to present sufficient evidence to raise a material fact question concerning whether KTIV's documented reason for his discharge was a pretext entitles KTIV to summary judgment as to O'Bryan's second and fourth causes of action. *See Brousard–Norcross v. Augustana College Ass'n,* 935 F.2d 974, 976 (8th Cir.1991) (holding that defendant in sex discrimination case entitled to summary judgment where defendant produces evidence of legitimate non-discriminatory reason for adverse employment action and plaintiff fails to present evidence in form of specific facts showing proffered reason was pretext).

## IV. CONCLUSION

Therefore, for the reasons set forth above, the court concludes that KTIV's Motion for Summary Judgment shall be granted, judgment shall be entered for KTIV and Plaintiff O'Bryan's case shall be dismissed. Specifically, the court finds:

1. KTIV's motion shall be granted as to Plaintiff O'Bryan's first cause of action, that he was unlawfully demoted and discharged because of his age in violation of the ADEA, on the ground that O'Bryan has been unable to generate a material question of fact that KTIV stated reasons for his demotion and discharge were pretextual;

2. KTIV's motion shall be granted as O'Bryan's second and fourth causes of action, that he was terminated in retaliation for his filing of charges of discrimination, on the ground that O'Bryan has been unable to create a material question of fact as to the pretextual nature of KTIV's proffered, nondiscriminatory reasons for its actions;

3. KTIV's motion shall also be granted as to O'Bryan's third cause of action, that KTIV discharged O'Bryan in violation of ERISA, because O'Bryan is unable to demonstrate the existence of a material question of fact that the timing of O'Bryan's discharge and the savings to KTIV created an inference of discrimination;

4. KTIV's motion is further granted as to O'Bryan's fifth cause of action, invasion of privacy, because the court found that O'Bryan has failed to show that KTIV was responsible for the search, and that he had a reasonable expectation of privacy that his employer would not search his desk or office area for employer owned documents;

5. KTIV's motion is granted as to O'Bryan's sixth cause of action, that KTIV cast O'Bryan in a false public light and defamed him, because the statement identified by O'Bryan is not, as matter of law, slanderous per se.

6. KTIV's motion is also granted as to O'Bryan's seventh cause of action, intentional infliction of emotional distress, on the ground that as a matter of law, the Iowa Civil Rights Act provides the exclusive remedy for the alleged conduct;

**1178**

7. KTIV's motion is granted as to O'Bryan's eighth cause of action, wrongful discharge in violation of Iowa Public Policy, because, as a matter of law, the Iowa Civil Rights Act provides that exclusive remedy for the alleged conduct;

8. KTIV's motion is granted as to O'Bryan's ninth cause of action, breach of an implied covenant of good faith and fair dealing, on the ground that the Iowa Supreme Court has not recognized this cause of action;

9. KTIV's motion is finally granted as to O'Bryan's eleventh cause of action, that he was unlawfully demoted and discharged because of his gender in violation of Title VII, on the ground that O'Bryan has been unable to generate a material question of fact that KTIV's stated reasons for his demotion and discharge were pretextual.

**IT IS SO ORDERED.**